OPINION
{¶ 1} Appellant, Derek A. Smith, appeals the Portage County Municipal Court's judgment entry denying his motion to suppress evidence and its judgment convicting him, after trial by jury, of operating a vehicle while intoxicated (OVI), refusing to submit to a breathalyzer, and a marked lanes violation. For the reasons set forth below, the judgments of the lower court are affirmed in part, reversed in part, and remanded for further proceedings. *Page 2 
 {¶ 2} On March 2, 2006, Trooper Thomas Shevlin of the Ohio State Highway Patrol observed appellant drive his vehicle approximately 4 feet over the centerline of State Route 44 and then over the edge line of the road. The trooper subsequently initiated a traffic stop. Upon approaching the vehicle, the trooper requested appellant to produce his driver's license and insurance information. While conversing with appellant, the trooper smelled a strong odor of alcoholic beverage; he further observed that appellant's speech was slurred and his eyes were bloodshot and glassy. Appellant admitted to consuming two beers. The trooper gave appellant a portable breath test (PBT) which registered .106.[1]
 {¶ 3} Next, although it was raining heavily, the officer had appellant step outside the cruiser to perform field sobriety tests. The videotape from the cruiser revealed the officer conducted the "walk-and-turn" test as well as the "one-leg stand" test.[2] After reviewing appellant's performance, the trooper concluded appellant failed each test. The trooper also administered the horizontal gaze nystagmus (HGN) test which *Page 3 
appellant also failed.[3] The trooper placed appellant under arrest for driving under the influence of alcohol and transported him back to the post.
 {¶ 4} At the post, the trooper fully advised appellant regarding the consequences of refusing a breath test, read the BMV 2255 form, and provided appellant with a specific and detailed recitation of the instructions for taking the breathalyzer. After appellant indicated he understood the instructions, the trooper commenced the test. Appellant started blowing into the machine, stopped, started again, and again stopped. The machine produced an invalid sample reading. Because appellant indicated he understood the instructions and did not state he was unable to take the test, the trooper interpreted appellant's conduct as a refusal to take the test.
 {¶ 5} On the same day, a traffic ticket was filed in the Portage County Municipal Court alleging appellant had operated his vehicle under the influence of alcohol, in violation of R.C. 4511.19 and appellant had engaged in a marked lines violation, in violation of R.C. 4511.33. Appellant was also charged with refusal to submit to a breathalyzer. Appellant moved to suppress evidence of the field sobriety tests and the determination that appellant refused to take the breathalyzer. Following a hearing on the matter, the motion was denied and the matter proceeded to jury trial. After trial, the jury returned a verdict of guilty on the OVI charge, the refusal charge, and the court found appellant guilty on the marked lanes violation. Appellant was sentenced to 180 days in jail, conditionally suspending 167 of those days, imposed the maximum $1,000 fine, ordered appellant to complete "DUI" school, suspended appellant's license for 18 *Page 4 
months, imposed 48 hours of community service, placed appellant on probation for 1 year, and ordered appellant to wear an alcohol detecting ankle bracelet during his probation.
 {¶ 6} Appellant now appeals asserting seven assignments of error.
 {¶ 7} Appellant's first assignment of error asserts:
 {¶ 8} "The trial court erred by denying appellant's motion to suppress."
 {¶ 9} Appellate review of a trial court's ruling on a motion to suppress evidence presents a mixed question of law and fact. State v.Burnside, 100 Ohio St.3d 152, 154, 2003-Ohio-5372. During a hearing on a motion to suppress evidence, the trial judge acts as the trier of fact and, as such, is in the best position to resolve factual questions and assess the credibility of witnesses. State v. Mills (1992),62 Ohio St.3d 357, 366. An appellate court reviewing a motion to suppress is bound to accept the trial court's findings of fact where they are supported by competent, credible evidence. State v. Guysinger (1993),86 Ohio App.3d 592, 594. Accepting these facts as true, the appellate court independently reviews the trial court's legal determinations de novo.State v. Djisheff, 11th Dist. No. 2005-T-0001, 2006-Ohio-6201, at ¶ 19.
 {¶ 10} Appellant first argues the trial court erred in denying his motion to suppress evidence to the extent the breathalyzer test was not performed in substantial compliance with the directives of the "Ohio Director of Health, the Ohio Administrative Code, and the Ohio Revised Code." Specifically, appellant takes issue with the arresting officer's decision to label appellant's attempt but ultimate failure to provide an adequate sample of breath a refusal to submit to the chemical test. *Page 5 
 {¶ 11} Pursuant to the authority set forth under R.C. 3701.143, the Department of Health has promulgated regulations for chemically analyzing an individual's blood, urine, breath, or other bodily substances to ascertain the presence and amount of alcohol. See OAC 3701-53-04 through 3701-53-09. Where an issue related to these regulations is properly raised, the state must demonstrate substantial compliance with the Administrative Code before the results of any such tests are admissible in evidence against any criminal defendant.State v. Lake, 151 Ohio App.3d 378, 2003-Ohio-332, at ¶ 13. Once the state proves substantial compliance, a defendant has the burden of proving prejudice by less than literal compliance. Id., citing,State v. Plummer (1986), 22 Ohio St.3d 292, 295.
 {¶ 12} A person may be understood to refuse a chemical test "whenever a preponderance of all the evidence shows that the person who was given the request and advice in the statutory manner and form has thereafter conducted himself in such a way as to justify a reasonable person in the position of the requesting officer to believe that such requested person was capable of refusal and manifested unwillingness to take the test."Andrews v. Turner (1977), 52 Ohio St.2d 31, paragraph one of the syllabus.
 {¶ 13} Here, the arresting officer testified he provided appellant with a "very in depth" explanation as to how the test would be conducted. The trooper communicated:
 {¶ 14} "* * * that [the test] is going to take approximately 15 to 20 seconds. It's deep lung air so when the machine clicks over to where we're going to take a sample from you, what you need to do is take a deep breath, blow constant and steady for approximately 20 seconds or until I hear the machine click off. Do you understand the instructions, and I explain them to every person I ever arrest for DUI, and when the *Page 6 
person indicates that they do understand that then I said okay, the machine's ready, it's beeping. When you start blowing it's going to be one steady tone. Just continue to blow until I tell you differently."
 {¶ 15} According to the trooper, appellant indicated he understood the instructions and began the test. Appellant blew into the machine but stopped blowing. He started again, and again stopped. Eventually the machine "invalidated" appellant's sample and, without offering appellant the opportunity to take a second test, the trooper interpreted appellant's actions to be a refusal. The trooper explained his reasons for arriving at this conclusion:
 {¶ 16} "If the person indicates yes, [I understand,] starts blowing and then stops, and starts and stops, you only have two minutes to gather the air so if a person starts and stops, I tell them don't stop blowing. You need to continue. It's got to be deep lung air until you get a valid sample. Keep blowing, keep blowing. If they stop again I tell them, keep blowing. Keep blowing until I tell you differently. If they then keep starting and stopping, I feel I've done what I can do as far as getting their breath sample."
 {¶ 17} Appellant first asserts the trooper improperly treated his invalid result as a refusal. In support of his position, appellant directs our attention to the Tenth Appellate District's opinion inState v. Markin, 149 Ohio App.3d 274, 2002-Ohio-4326. InMarkin, the court stated: "[a]n `invalid sample' reading does not express the results in [terms acceptable under the OAC]; it merely indicates `invalid sample.' Because an `invalid sample' does not express its results in the manner prescribed by the regulation, it is not a `test result' within the parameters of the regulation." Id. at ¶ 47. Pursuant to Markin, *Page 7 
an invalid sample cannot be construed as a "test result" and, therefore, appellant maintains, cannot be a basis for a determination that a party refused.
 {¶ 18} Markin is inapplicable to the instant matter. The issue inMarkin was whether an arresting officer violates the OAC when he or she fails to retain a printout of an invalid sample reading. The court inMarkin answered this question in the negative and, in doing so, emphasized that the OAC merely requires an officer to retain breathalyzer test "results." As an invalid sample reading is not a "result" under the statute, an officer is not required to retain a printout of such a reading. Here, no such argument was made before the trial court. Rather, the only issue raised at the suppression hearing was whether the trooper's determination that appellant's conduct manifested an unwillingness to take the test was proper. Nothing inMarkin offers any guidance as to the resolution of this issue.
 {¶ 19} Appellant next directs our attention to a December 14, 1998 memorandum circulated by the Bureau of Alcohol and Drug Testing, to all BAC DataMaster Sites, which states:
 {¶ 20} "Effective immediately, an `invalid sample' indicating on the BAC Verifier or BAC DataMaster is to be handled by initiating a new 20 minute observation period. The reason for this change is due to the fact that invalid sample' may be caused by different things. The operator will no longer have to decide exactly what may have caused the `invalid sample,' the remedy will always be a new observation period."
 {¶ 21} Because appellant's breathalyzer test returned an "invalid sample" reading, he argues that the foregoing directive unequivocally required the trooper to offer appellant the opportunity to take another test. In other words, appellant asserts an *Page 8 
"invalid sample" reading cannot count as a constructive refusal and therefore the officer erred in drawing such a conclusion.
 {¶ 22} Although its language is unambiguous, the directive does not represent an authoritative rule we are bound to enforce. Unlike the OAC, "a directive from a memorandum does not rise to the level of an administrative regulation, and is not enforceable." State v.Gigliotti (Dec. 22, 2000), 6th Dist. No. E-99-081, 2000 Ohio App. LEXIS 6052, *16; see, also, State v. Reiger, 5th Dist. No. 02CA30, 2002-Ohio-6673, at ¶ 13; State v. Hayes, 9th Dist. No. 04CA0105-M,2005-Ohio-6607, at ¶ 16; State v. Massie, 2d Dist. No. 2007 CA 24,2008-Ohio-1312, at ¶ 20.[4] We do not deny that the trooper had the option of conducting a second test. However, appellant does not point to, nor are we aware of, any code section that would require the trooper to do so under circumstances such as this. Thus, we shall consider the propriety of the trooper's conclusion that appellant's actions manifested a constructive refusal pursuant to Andrews, supra.
 {¶ 23} The record indicates that the trooper provided appropriately clear instructions regarding the manner in which appellant was required to perform the test. Appellant represented that he understood the instructions. However, appellant repeatedly disregarded the directions as they related to how he was supposed to blow into the BAC DataMaster. Nothing in the record indicates appellant was physically *Page 9 
unable to provide the breath sample necessary to obtain a valid reading. In light of appellant's conduct, the trooper concluded that appellant was deliberately attempting to invalidate the reading. Viewing the evidence in its totality, we therefore hold, a reasonable officer could conclude (1) appellant was capable of refusing the test and (2) his conduct manifested an unwillingness to take the test. Such facts are sufficient to rise to the level of a constructive refusal.Andrews, supra. The trial court did not err in denying appellant's motion to suppress on this issue.
 {¶ 24} Appellant also argues the trial court erred in overruling his motion to suppress for the following reasons: (1) there was no evidence that the operational manual for the DataMaster was on file pursuant to OAC 3701-53-01 (B); (2) the Horizontal Gaze Nystagmus (HGN) test did not substantially comply with the NHTSA OVI detection and standardized field sobriety testing manual; and (3) the coordination tests did not substantially comply with the NHTSA OVI detection and standardized field sobriety testing manual.
 {¶ 25} First, appellant did not raise the issue of whether the operations manual for the DataMaster was available or "on file" in his motion to suppress. Moreover, this issue was not a matter argued during the suppression hearing. As this issue was not before the trial court, the absence of evidence relating to the existence of the manual cannot be a basis for reversal.
 {¶ 26} Furthermore, at the hearing on appellant's motion, defense counsel initially limited the issues to "[f]ield sobriety tests * * * and the issue of a refusal to take the breath test." Both of which were specifically raised in his motion to suppress evidence. However, after direct examination of the arresting officer commenced, the *Page 10 
trial court interrupted the prosecutor and asked the following question: "We're not arguing probable cause for the stop or the arrest, [defense counsel]?" To which defense counsel responded "No, your Honor." However, defense counsel proceeded to cross-examine the arresting officer on his method of conducting the field sobriety tests and the conditions in which they were administered. Neither the trial court nor the prosecutor intervened to limit the content of the hearing merely to the issue of the refusal.[5] Moreover, in its judgment entry overruling appellant's motion to suppress, the trial court addressed both the propriety of the field sobriety tests and the validity of the arresting officer's conclusion that appellant refused the breathalyzer. As neither the court nor the parties treated defense counsel's representation as a concession of probable cause, we shall proceed with analysis of the HGN and coordination tests.
 {¶ 27} With respect to the HGN test, appellant asserts the arresting officer did not substantially comply with the NHTSA testing manual. In particular, he argues that the officer was unable to achieve a sufficiently accurate 45 degree angle for the "onset of nystagmus at 45 degrees" phase of the HGN. The trooper testified he held the stimulus between 10 and 12 inches from appellant's nose and moved the pen between 8 to 9 inches away from appellant's shoulder to reach an angle of 45 degrees. Appellant points out the angle was improper because the manual requires an officer to hold the stimulus between 12 and 15 inches and the distance from the shoulder is not a recognized means of measurement under Ohio law. *Page 11 
 {¶ 28} Although the NHTSA manual does not specifically reference the positioning of a suspect's shoulders as a means of measuring a 45 degree angle, the manual specifically states that the measurement of the angle is an estimation. An officer is not required to use technical tools such as a protractor or goniometer and, as a result, is not required to possess Cartesian precision in measuring the angle. This, in conjunction with the recognition that the measurement of a 45 degree angle will vary depending on a person's relative size, leads to the common sense conclusion that an approximation will always be necessary.
 {¶ 29} Here, the officer provided a specific measurement as it related to appellant, i.e., the stimulus was "approximately 8 to 9 inches" from appellant's shoulder. He also testified that 45 degrees is "approximately" the midpoint between the nose and shoulder. Given the totality of the evidence, we hold the trooper's method substantially complied with the NHTSA manual. The trial court did not err in overruling appellant's motion on this issue.
 {¶ 30} Next, appellant argues that the "walk-and-turn" and "one-leg stand" tests did not substantially comply with the NHTSA manual. Specifically, appellant argues the conditions in which the coordination tests were administered were too hazardous to yield reliable results.
 {¶ 31} At the suppression hearing, the arresting officer testified, after stopping appellant, he asked him for his driver's license and insurance. The trooper noticed appellant's speech was slurred and he had an odor of alcoholic beverage about his breath. The trooper also noticed appellant possessed bloodshot, glassy eyes. The trooper subsequently asked appellant to perform the above mentioned field sobriety *Page 12 
tests outside the vehicle. According to the trooper, it was raining heavily but he did not feel it was necessary to administer the tests in "more ideal conditions." After completing the tests, the officer observed 3 clues on the one-leg stand test and 5 clues on the walk-and-turn test, each result constituted a failure.
 {¶ 32} Although the tests were conducted in heavy rain, the record of the suppression hearing does not indicate the conditions of the roadway on which the tests were conducted were otherwise overly dangerous. Furthermore, while the videotape of the coordination tests is substantially inaudible, the trooper's testimony at the suppression hearing indicated he fully and properly explained the manner in which the tests were to be completed. Finally, although the trooper admitted that wet asphalt "can get slippery," there was no testimony nor any visual evidence on the videotape indicating the roadway in questionwas actually slippery. Simply because the environmental conditions were less than ideal does not, by itself, render the tests invalid. Without more evidence of a deviation from the proper procedures set forth in the NHTSA manual, we hold the trial court did not err in admitting the evidence.
 {¶ 33} Because appellant's actions demonstrate a constructive refusal to take the breathalyzer and because the record demonstrates the field sobriety tests were executed in substantial compliance with the NHTSA manual, we hold the trial court did not err in overruling appellant's motion to suppress evidence.
 {¶ 34} Appellant's first assignment of error is overruled.
 {¶ 35} We shall next address appellant's third, fourth, and fifth assignments of error together. These assigned errors read, respectively: *Page 13 
 {¶ 36} "[3.] The trial court abused its discretion by failing to grant appellant's motion for a mistrial after the court expressed an opinion on the evidence in the presence of the jury.
 {¶ 37} "[4.] The trial court erred by expressing an opinion on the evidence in the presence of the jury.
 {¶ 38} "[5.] The trial court committed judicial misconduct by statements made to defense counsel in the presence of the jury throughout the jury trial."
 {¶ 39} Under his third assignment of error, appellant argues that the trial court erred in not granting a mistrial after it stated, in front of the jury, that counsel should cease examining the arresting officer on his administration of the HGN test because it had previously "determined that these tests were done in accordance with NHTSA standards." His fourth assignment of error alleges the court's statement prejudiced his defense because it was an expression of the court's opinion as to the probative value of the evidence and the credibility of the state's sole witness. Finally, appellant's fifth assignment of error asserts the trial court committed judicial misconduct when, during closing argument in front of the jury, the judge improperly castigated trial counsel to such an extent counsel could not speak without interruption.
 {¶ 40} Pursuant to R.C. 2945.03, "[t]he judges of the trial court shall control all proceedings during a criminal trial, and shall limit the introduction of evidence and the argument of counsel to relevant and material matters with a view to expeditious and effective ascertainment of the truth regarding matters in issue." See, also, State v.Miller, 11th Dist. No. 2004-T-0092, 2005-Ohio-5283, at ¶ 20. Further, in presiding over a trial, a judge must be cognizant of the effect of his or her remarks upon the jury. State v. *Page 14 Wade (1978), 53 Ohio St.2d 182, 187. However, this does not imply a judge is precluded from making remarks during the course of a trial.State v. Hardy (Oct. 10, 1997), 11th Dist. No. 96-P-0129, 1997 Ohio App. LEXIS 4588, *20. An appellate court reviewing the propriety of a judge's remarks before a jury must determine whether the comments were prejudicial to a defendant's right to a fair trial. Wade, supra, at 188; see, also, Miller, supra, at ¶ 21.
 {¶ 41} To aid in this determination, the Supreme Court of Ohio has stated that courts shall adhere to the following rules: "(1) The burden of proof is placed upon the defendant to demonstrate prejudice, (2) it is presumed that the trial judge is in the best position to decide when a breach is committed and what corrective measures are called for, (3) the remarks are to be considered in light of the circumstances under which they are made, (4) consideration is to be given to their possible effect upon the jury, and (5) to their possible impairment of the effectiveness of counsel." Wade, supra.
 {¶ 42} The comment upon which appellant's third and fourth assignments of error are based arose during defense counsel's re-cross of the arresting officer on his administration of the HGN test. Counsel was examining the officer on the relative importance of the distance the officer's stimulus was from the face of appellant particularly as it related to the officer's estimation of a 45 degree angle for the "onset prior to 45 degrees" component of the test. The following exchange took place:
 {¶ 43} "[Defense Counsel]: And your basis for saying that he failed that clue is based upon your opinion that there was onset of nystagmus before 45 degrees?
 {¶ 44} "[Trooper]: It's based on my training and experience, also.
 {¶ 45} "[Defense Counsel]: I understand that. And it's — *Page 15 
 {¶ 46} "[Trooper]: And it's based on approximation of 45 degrees. If you're saying can I tell you exactly what 45 degrees is without measuring it, my answer to you is no. It's an approximation.
 {¶ 47} "THE COURT: Mr. Bradley, we've going [sic] through this hearing before and we've determined that these tests were done in accordance with NHTSA standards, so go on with another question.
 {¶ 48} "[Defense Counsel]: Judge, I'd ask that you instruct the jury to disregard any statements that are being made by the court regarding anything — [.]"
 {¶ 49} Defense counsel then moved for a mistrial which the trial court denied. Further, the court did not immediately provide the jury with an instruction to ignore its comments. However, after all the evidence was submitted, the court provided the following curative jury instruction:
 {¶ 50} "Now, if during the course of the trial the Court, meaning me, did or said anything that you consider expresses the Court's views on the facts, you are instructed to disregard it."
 {¶ 51} While the admissibility of field sobriety tests is a question of law, once the evidence is admitted, cross-examination of how the arresting officer conducted the tests is proper. State v. Dean, 11th Dist. No. 2007-P-0025, 2007-Ohio-6947, at ¶ 38. That is, "`[t]he manner and circumstances under which the tests were conducted present factual issues which affect the weight to be given to the tests.'" Id., quoting,State v. Heavener (June 4, 2002), 5th Dist. No. 2000CA00339, 2001 Ohio App. LEXIS 2784, at *10-*11 (Hoffman, J., concurring); see, also,State v. Boczar, 113 Ohio St.3d 148, 153, 2007-Ohio-1251 (stating "[t]he potential compromise of reliability [of field sobriety tests] *Page 16 
caused by the lack of strict compliance can be shown by the defense on cross-examination.")
 {¶ 52} Here, the issue of the admissibility of the HGN test, inter al., had been resolved at the suppression hearing. However, the trial court's decision to overrule appellant's motion did not take away his right to challenge the "manner and circumstances under which the tests were conducted" before the jury. Dean, supra.
 {¶ 53} With this in mind, it is clear that the trial court's remark that the field sobriety tests "were done in accordance with the NHTSA standards" represented a specific conclusion relating to a factual issue that the jury was entitled to consider. In our view, this comment was completely improper as it fundamentally directed the jury to conclude that the tests were valid and proper. Even had counsel been permitted to continue his examination of the officer as to the manner in which he conducted the HGN or the other field sobriety tests, the value and impact of any such line of questioning (or any previous cross-examination) likely would have been abrogated by the court's comment.
 {¶ 54} A judicial remark, such as the one under scrutiny, exceeds fair guidance where it carries a high risk of influencing the jury to achieve a particular verdict. See Anderson v. Warden, Maryland Penitentiary
(C.A. 4, 1982), 696 F.2d 296, 301, f.n. 1, citing R.Traynor, The Riddle of Harmless Error, 71-71 (1970). Such commentary is inimical to the fair administration of justice as it fundamentally infringes upon the jury's role and impermissibly reduces the state's burden of proof. The trial court, in making the statement, declared in open court that the field sobriety tests were done in compliance with NHTSA standards implying they were reliable and legally valid. Such a remark in *Page 17 
an OVI trial is tantamount to a legal declaration that the state has met its burden and the jury should therefore find the defendant guilty. We therefore believe the judge's comment contaminated the fairness of the proceedings.
 {¶ 55} With this in mind, we point out that, immediately prior to the jury retiring for deliberation, the trial court provided a limiting instruction ordering the jury to disregard any remarks it may have made regarding the evidence. Typically, a trial court's instruction to disregard any perceived expression of its opinion weighs against a finding of prejudice. See, e.g., State v. Loza, 71 Ohio St.3d 61, 75,1994-Ohio-409 (observing that a jury is presumed to follow the instructions of the trial court). However, given the quality of the comment and the timing of the limiting instruction, we do not believe the instruction can be construed as adequately curative. The court waited until the close of trial to provide the instructiondespite counsel's exhortation that the court give such an instruction immediately following the comment. Given the timing of the limiting instruction and the egregious nature of the remark, we do not believe it could "unring" the proverbial bell.
 {¶ 56} Our conclusion is worth clarifying. The remark was not made by a witness or even the prosecutor. It was made by the judge presiding over the trial. Although the judge could have instructed the jury to ignore the comment immediately after it was made, he did not.[6] It is patent "`* * * that juries are highly sensitive to every utterance by the trial judge, the trial arbiter * * *.'" State v. Thomas (1973),36 Ohio St.2d 68, 71, quoting Bursten v. United States (C.A. 5, 1968),395 F.2d 976, 983. "Even a cautionary *Page 18 
instruction * * * may not counteract the force of comment attended by the authority of the judge's office." Anderson, supra. Consequently, it must be borne in mind that "* * * the influence of the trial judge on the jury is necessarily and properly of great weight, and that his lightest word or intimation is received with deference, and may prove controlling."Starr v. United States (1894), 153 U.S. 614, 626. See, also,Thomas, supra. In recognition of the authority and influence wielded by the trial judge, we hold the limiting instructions offered by the court in the matter sub judice were insufficient to cure the prejudice necessarily flowing from the court's comment. We therefore hold, notwithstanding the limiting instruction, the trial court's comment fundamentally prejudiced appellant's right to a fair trial.
 {¶ 57} As though his remark on the evidence was not enough, the trial judge, again in the jury's presence, unnecessarily upbraided defense counsel and caustically criticized his professional reputation during closing arguments. Once the prosecutor finished his initial closing, defense counsel began his argument. After summarizing the main points of the evidence, defense counsel stated: "I think all of you believe in this system. Obviously — [.]" With no objection by the state, the trial court interrupted counsel, warning him: "You're getting beyond closing argument. You're getting into your personal beliefs. Go onto what the evidence showed and inferences from that. * * *." Defense counsel continued with an apology to the jury, urging the factfinder to base its decision on the evidence. Defense counsel then remarked upon his views relating to the importance of cross-examination. The court interrupted again, stating "* * * I've warned you a couple of times. You can't get into your personal beliefs about what you did on cross examination. It doesn't matter. You got to go into what the evidence *Page 19 
showed." Defense counsel replied "I'm not talking about myself. I'm talking about you, collectively as a juror asking questions — [.]" The court advised defense counsel he could not talk about such things, the following exchange took place:
 {¶ 58} "[Defense Counsel]: Judge, is this like you and the Prosecutor —
 {¶ 59} "THE COURT: Mr. Bradley, please, it's not me and the Prosecutor. You know the rules of evidence. You told [me] you've been practicing for 29 years. You obviously haven't practiced very well because you're not talking about things that are relevant in this case.
 {¶ 60} "Your beliefs are definitely not allowed to be presented to the jury. You can't say, `I feel,' `It's my opinion.' Don't do it again or you're done with your closing argument. I'll make you sit down right now. If you bring it up again and if you start criticizing the Court, I'll hold you in contempt.
 {¶ 61} "[Defense Counsel]: Judge, all I'm asking —
 {¶ 62} "THE COURT: Now, stop it, Mr. Bradley —
 {¶ 63} "[Defense Counsel]: The Prosecutor object —
 {¶ 64} "THE COURT: Mr. Bradley I've told you the Prosecutor doesn't need to object, Mr. Bradley, and don't try to play sympathy with the jury with that. That's not going to work.
 {¶ 65} "[Defense Counsel]: Judge, I'm just —
 {¶ 66} "THE COURT: Mr. Bradley, stop. Argue the case the way it's supposed to be argued about what the evidence showed, not about personal opinions, not about collective thoughts of the jury. Go on or I'll have you sit down if you're not going to do that. *Page 20 
 {¶ 67} "[Defense Counsel]: I apologize to you, ladies and gentlemen. I said something I shouldn't have said —
 {¶ 68} "THE COURT: You've already done that three times. Go on with the evidence what the evidence showed, Mr. Bradley. You've already apologized to the jury three times.
 {¶ 69} "[Defense Counsel]: This is final argument —
 {¶ 70} "THE COURT: Mr. Bradley, you've apologized to the jury three times.
 {¶ 71} "[Defense Counsel]: I'm not going to apologize anymore.
 {¶ 72} "THE COURT: Just go on with what you think the evidence showed.
 {¶ 73} "[Defense Counsel]: This is final argument.
 {¶ 74} "THE COURT: Go on with what the evidence showed.
 {¶ 75} "[Defense Counsel]: I think I've said enough. I think the Judge thinks I've said enough so I close."
 {¶ 76} We first point out that the trial court was entitled to intervene during closing argument to provide guidance as to its concerns regarding the parameters of defense counsel's closing argument.[7]
However, the initial intervention quickly evolved from a legitimate concern for procedure to a heavy-handed, insulting, and unnecessary display of authority. The trial judge's remarks transcended legitimate methods of courtroom control which served to fundamentally encumber defense counsel's ability to effectively represent appellant. In fact, the trial judge's gratuitous vilification and general *Page 21 
hostility directed at defense counsel ultimately caused him to sit down and refrain from completing his closing argument.
 {¶ 77} The record does not indicate defense counsel blatantly and/or intentionally defied the court's warnings as they related to the direction he was taking his closing argument. Rather, it appears defense counsel did not understand the full thrust of the trial judge's ruling regarding the direction of his closing. Even if, after his initial warning, the trial judge viewed counsel's approach to closing inappropriate, the judge should have called a side bar, outside the earshot of the jury, and underscored that defense counsel's method of argument was, in the court's view, improper. The trial judge could have tersely and effectively reiterated his ruling in this private setting and thereby avoided the open-court confrontation. In our estimation, the trial court's management of this situation exhibited a lack of circumspection, patience, and respect for the proceedings as well as defense counsel. The court's remarks relating to counsel's professional abilities as well as the pervasive interruptions assuredly affected the jury's perception of defense counsel and, thus, had a negative impact the fairness of the proceedings.
 {¶ 78} We recognize that a trial judge enjoys a presumption that his conduct and actions are fair and impartial. In re Disqualification ofKilpatrick (1989), 47 Ohio St.3d 605, 606. However, a judge's declaration, in front of the jury, regarding the validity and therefore the legal sufficiency of the state's evidence is more than adequate to overcome this general presumption of fairness. Moreover, the judge's interruptions, remarks, and rebukes during defense counsel's closing, all of which again occurred in front of the jury, exhibit a fundamental lack of restraint and judicial temperament. *Page 22 
Counsel's effectiveness was wholly impaired by the cumulative effect of the trial judge's remarks and criticisms during trial. Viewed objectively, such conduct cannot be seen as fair and impartial. Observing the judge's actions cumulatively, we hold appellant was clearly prejudiced by the trial judge's conduct and actions and therefore was denied a fair trial.
 {¶ 79} Appellant's third, fourth, and fifth assignments of error are sustained.
 {¶ 80} Appellant's sixth assignment of error asserts:
 {¶ 81} "The trial court abused its discretion by prohibiting appellant from cross-examining trooper Shevlin with the NHTSA DWI detection and standardized field sobriety testing manual."
 {¶ 82} Appellant asserts the trial court abused its discretion by not allowing him to cross-examine the arresting officer using the NHTSA manual. The substance of this argument is closely related to the trial court's inappropriate comments addressed under appellant's third and fourth assigned errors.
 {¶ 83} We first point out that the trial court did not explicitly deny appellant the ability to use the NHTSA manual on cross-examination. To the contrary, the trial court determined that defense counselcould use the NHTSA manual to cross-examine the officer's knowledge of the standards relating to the HGN test. However, the trial court became impatient with the defense counsel's phraseology during this aspect of cross-examination. This impatience led to the trial court's comment that "the tests were done in accordance to the NHTSA standards."
 {¶ 84} Specifically, during cross-examination, defense counsel challenged the trooper's method of measuring a 45 degree angle for purposes of the HGN: *Page 23 
 {¶ 85} "[Defense Counsel]: To say that he failed that particular point of the test, it's critical to know where that 45 degrees is based upon where you have the pen in relationship to where the nystagmus starts. It's critical, isn't it?
 {¶ 86} "[Prosecutor]: Objection as to the characterization.
 {¶ 87} "THE COURT: I would think you must get rid of the word critical when you ask that question. Sustained.
 {¶ 88} "[Defense Counsel]: It's the difference between passing and failing that particular clue for both eyes, isn't it?
 {¶ 89} "THE COURT: Well, when we get into the definition of words, it becomes very confusing for people because that may mean something to the officer different than what you think it means. So, you have to ask the question without using that term.
 {¶ 90} "[Defense Counsel]: Well, you understand that for you to determine whether the person passed or failed that particular clue, that 45-degree angle is very important.
 {¶ 91} "THE COURT: Again, you're getting into whether something's important or not. You have to ask the question that doesn't require opinions.
 {¶ 92} "[Defense Counsel]: Judge, that's what he does.
 {¶ 93} "THE COURT: Not on words. Not where you're using words, Attorney Bradley. We can get into questions of semantics and you can confuse the jury, and we're not going to do that.
 {¶ 94} "[Defense Counsel]: Judge, I'm not trying to confuse the jury.
 {¶ 95} "THE COURT: Well, just ask a question without — *Page 24 
 {¶ 96} "[Defense Counsel]: I'm trying to get the jury to understand what this all means because it's pretty confusing stuff.
 {¶ 97} "THE COURT: Well, I've already let you go further than I think I should have, so ask your next question."
 {¶ 98} Defense counsel proceeded to asked several more questions relating to the trooper's conclusion that appellant failed the HGN on the "onset prior to 45 degrees" portion of the test. Counsel avoided using terms such as "critical" or "important." The trooper ultimately testified the 45 degree measurement is simply an approximation. However, the trial court immediately intervened, without an objection from the prosecutor, and made its statement that "we've [gone] through this hearing before and we've determined that these tests were done in accordance with NHTSA standards, so go on with another question." Counsel's motion for a mistrial was subsequently denied and he moved on to a different line of questioning.
 {¶ 99} Although the trial court did not formally disallow defense counsel the use of the NHTSA manual, the court's attempt to limit cross-examination based upon "semantics" or "confusion of the jury" was inappropriate. Pursuant to the NHTSA manual, a necessary component of the HGN test is the onset of nystagmus prior to 45 degrees. In order to determine whether an officer substantially complied with the manual on this issue, it is also necessary for an officer to properly measure a 45 degree angle based upon the relative position of the subject who is tested. By asking the officer whether it is "critical" or "important" that the officer knows how to measure a 45 degree angle, defense counsel was simply inquiring into the officer's knowledge and appreciation of the basic elements of the test that he asserted appellant failed. *Page 25 
 {¶ 100} Given these observations, the trial court erred in concluding that the terms used by defense counsel were unnecessarily value-laden and confusing. The questions regarding whether the measurement of the angle was "critical" or "important" were foundational in nature. They were tantamount to asking whether the measurement is logically necessary for an accurate and trustworthy conclusion. We therefore hold the trial court's rulings arbitrarily and unreasonably limited counsel's ability to effectively cross-examine the trooper on the NHTSA requirements as they relate to the administration of the HGN test. Like the problems identified under appellant's third, fourth, and fifth assignments of error, the trial court's decision to limit defense counsel's cross-examination prejudiced appellant's right to a fair trial. As discussed above, the cumulative effect of these errors require reversal.
 {¶ 101} Appellant's sixth assignment of error has merit.
 {¶ 102} Appellant's remaining assignments of error allege:
 {¶ 103} "[2.] The appellant received ineffective assistance of counsel in violation of his rights pursuant to the Sixth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution.
 {¶ 104} "[7.] The appellant's convictions are against the manifest weight of the evidence."
 {¶ 105} Because appellant's third, fourth, fifth, and sixth assignments of error are dispositive of the instant appeal, his two remaining arguments are rendered moot.
 {¶ 106} For the reasons discussed above, appellant's first assignment of error is without merit and his third, fourth, fifth, and sixth assigned errors are sustained. Because appellant's third, fourth, fifth, and sixth assignments of error are well taken, we *Page 26 
hold appellant's second and seventh assignments of error are moot. Thus, the judgment entries of the Portage County Municipal Court are hereby affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.
MARY JANE TRAPP, J., TIMOTHY P. CANNON, J., concur.
[1] Portable breath test devices are not among those instruments listed in the Ohio Administrative Code as "approved evidential breath-testing instruments for determining the concentration of alcohol in the breath of individuals potentially in violation of R.C. 4511.19."State v. Shuler, 168 Ohio App.3d 183, 2006-Ohio-4336, at ¶ 10. InShuler, the court pointed out that "PBT results are considered inherently unreliable because they `may register an inaccurate percentage of alcohol present in the breath, and may also be inaccurate as to the presence or absence of any alcohol at all.'" Id., citingState v. Zell (Iowa App. 1992), 491 N.W.2d 196, 197. Various courts, including this one, have therefore determined that the results of PBTs are not admissible, even for a determination of probable cause. SeeState v. Delarosa, 11th Dist. No. 2003-P-0129, 2005-Ohio-3399; State v.Ferguson, 3d Dist. No. 4-01-34, 2002-Ohio-1763; State v. Derov, 7th Dist. No. 07 MA 71, 2008-Ohio-1672; Cleveland v. Sanders, 8th Dist. No. 83073, 2004-Ohio-4473; State v. Mason (Nov. 27, 2000), 12th Dist. No. CA99-11-033, 2000 Ohio App. LEXIS 5472.
[2] The videotape provides an opportunity to view the weather conditions and appellant's performance on the walk-and-turn test. However, because the trooper conducted tests immediately in front of his cruiser, it is difficult to see appellant's performance on the one-leg stand test. Moreover, all but twenty five seconds of the nearly two and one-half minute recording of the performance of the coordination tests is inaudible. As a result, it is impossible to hear or delineate the entirety of the instructions the trooper provided appellant.
[3] Because the trooper gave the HGN test in the cruiser, the videotape, which provided a view only of that directly in front of the vehicle, did not record the administration of the test.
[4] Moreover, it is worth noting that the chief of the Bureau of Alcohol and Drug testing has stated that "the reason for the memo [at issue] was to avoid the numerous requests for testimony in court about the possibility of an `INVALID SAMPLE' being the result of mouth alcohol." State v. Bosier (July 24, 2000), 12th Dist. No. CA99-11-036, 2000 Ohio App. LEXIS 3299, *5. Here, there is no evidence that appellant's "invalid sample" reading was due to the presence of "mouth alcohol" and appellant does not allege that to be the case. Rather, the evidence, when viewed as a whole, specifically indicates the invalid reading was a function of appellant's fractured or inconsistent blowing method.
[5] It is worth pointing out that the state, in its appellate brief, recognizes that, despite counsel's statement relating to probable cause "it appears he intended to challenge the admissibility of the field sobriety tests * * *."
[6] We draw no conclusion as to whether an immediate instruction would have sufficed to legally nullify the impact of the court's statement. Any such analysis or conclusion would be purely advisory.
[7] As the issue is not before us, we shall refrain from any substantive analysis of the propriety or wisdom of the trial court's initial ruling relating to the scope of defense counsel's closing. *Page 1